CARL E. FAUGHT ET AL., APPELLEES, V. PLATTE VALLEY
PUBLIC POWER & IRRIGATION DISTRICT, A PUBLIC
CORPORATION, APPELLANT.
51 N. W. 2d 253

Filed January 11, 1952.   No. 32987.

(141)

142

*Crosby & Crosby,* and *Beatty, Clarke, Murphy & Morgan,* for appellant.

*Smith Brothers,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs brought this suit in equity to cancel and rescind a water right deed and contract and quiet title to described farm land owned by them as against the same because of material changed conditions and abrogation of the deed and contract by defendant. Defendant for answer and cross-petition denied generally and specifically plaintiffs' right to relief prayed and sought a personal judgment against plaintiffs for increased annual water service maintenance charges allegedly due and unpaid by them for the years 1948, 1949, and 1950.

After hearing upon the issues the trial court rendered a decree which cancelled and terminated the contract as of December 3, 1949, the time when notice of rescission was operative, quieted the title to plaintiffs' land against the same, free and clear of any liens for maintenance charges accruing after December 3, 1949, upon

condition, however, that plaintiffs pay into court for the benefit of defendant the sum of $521.91, with interest at 7 percent within 60 days from date of the decree, and in event of default thereof the judgment and decree entered upon plaintiffs' petition should be vacated and set aside. Defendant's cross-petition was dismissed without prejudice to a future action for foreclosure of such unpaid liens arising from the contract.

Defendant's motion for new trial was overruled, and it appealed, assigning substantially that the judgment was not sustained by the evidence but contrary thereto, and contrary to law. We conclude that the assignments should not be sustained. Plaintiffs did not cross-appeal.

At the conclusion of the trial, but after argument and submission, defendant asked leave in open court to amend the prayer of its cross-petition, reducing its interest demand from 9 percent to 7 percent, and praying that any judgment awarded for maintenance service charges should be declared a lien upon plaintiffs' property and a foreclosure thereof should be decreed. The request with regard to interest was granted. The other part of the request was denied without prejudice to future action brought for that purpose. In defendant's brief it was argued that the trial court thus erred. In that regard, however, it appears from the record that defendant did not assign such alleged error either in its motion for new trial or in its brief filed in this court. The applicable rule is that to obtain a review of errors of law occurring upon the trial of an equity case, a motion for new trial must be filed assigning the same therein. Oertle v. Oertle, 146 Neb. 746, 21 N. W. 2d 447. Likewise, such alleged errors must be assigned and discussed in the brief filed in this court on appeal, or they will not ordinarily be considered. Hartman v. Hartmann, 150 Neb. 565, 35 N. W. 2d 482. In any event, however, the form of the judgment was such that in the light of our conclusions herein, defendant could not have been preju-

diced in any manner by the court's refusal to permit the amendment.

The facts are not in dispute. The record discloses that in March 1935, Hastings College owned the farm lands here involved. On and prior to that time, Dawson County Irrigation Company was a privately organized and operated Nebraska common carrier public service utility corporation, with a water appropriation from the state. On March 2, 1935, the College entered into a written contract with such corporation whereby it sold and conveyed to the College and to its heirs and assigns "the right to use water from the canal of the" corporation, including a pro rata share of its available contractual reservoir waters "during the irrigation season of each year, in an amount not exceeding" a designated rate "to be used upon and for the purpose of irrigating" the described lands here involved. The consideration therefor was $750 paid in cash by the College and payment by it "annually in advance, on or before the first day of March in each and every year, the further sum of one and 50/100 ($1.50) Dollars, per acre of the land above described, as an annual maintenance charge" which payments were made a lien upon the land from the date when they became due, plus, as further consideration, a waiver and release of any and all claims then existing in favor of the College for loss or damage by reason of any leakage, seepage, breakage, or overflow from any of the canals, laterals, sub-laterals, or ditches of the corporation to any land owned or controlled by the College, together with a conveyance of a right-of-way through the land for the canal and the laterals of the corporation as then constructed upon the land.

The contract contains no date of termination except as hereinafter recited, and it was agreed therein that "this contract shall have the force and effect of a covenant running to and with the said land * * * for above described, and the canal * * *." It provided that "The

*water* to be furnished under this agreement is intended to form a part of the appurtenances to the said land above described, and the right thereto shall be transferable only with and run with said land" and that the corporation should be "bound by this instrument to all present and subsequent owners of said land, but to no other person." (Italics supplied.)

The agreement was made upon the express condition that if the College, its heirs, or assigns, at any time failed, neglected, or refused to make any of the annual maintenance charge payments at the time the same became due and payable, the corporation should have the election, without notice, to furnish the supply of water and sue for the annual payment in law or equity at its election or upon such default to shut off such supply and cease to furnish water under its provisions until payment was made of all such defaulted payments to the corporation with interest thereon at 9 percent from date of default until date of payment, and that upon full payment of such defaulted payments with interest, the College should be reinvested with all rights and privileges theretofore conferred, provided, however, that if any annual payment to be made should remain unpaid and in default for a period of three years, the corporation at its option and upon 60 days' notice in writing to the College, could declare the contract and deed forfeited for failure to pay such maintenance charge, whereupon the deed and contract should terminate and the rights granted therein should revert to the corporation. The contract was appropriately recorded.

The land involved is located four and one-half miles from the main canal on the end of a lateral serving several other consumers.

In 1941 defendant, a public power and irrigation district organized under the provisions of sections 70-601 to 70-671, R. R. S. 1943, purchased all the property and assets and expressly assumed and succeeded to all the

rights, liabilities, and obligations of the Dawson County Irrigation Company, a corporation.

In February 1947, plaintiffs purchased the farm land here involved, and received an ordinary warranty deed to the same, which did not refer in any manner to the water right here involved. They took possession and used no irrigation water in 1947 but paid defendant the annual maintenance charge of $1.50 an acre for that year as specifically provided in the water right deed and contract. In that connection, the fact is that the land was planted to alfalfa, and since it was underlaid with a body of underground water at a depth of about 10 feet at the highest point, no irrigation water was necessary, and they used none during 1947, 1948, 1949, or 1950, although the district was ready and willing during 1948, 1949, and 1950, upon sufficient notice, to deliver such water to them upon request if they would pay an increased maintenance rate hereinafter discussed, which plaintiffs refused to do.

On December 5, 1947, the district, without reference to any regulatory authority except by resolution of its own board of directors and without permission or consent of plaintiffs, as allegedly authorized by section 70-655, R. R. S. 1943, increased the annual maintenance charge for irrigation water service to its users from the contract rate of $1.50 an acre to $2.25 an acre, thus increasing the annual maintenance charge to plaintiffs, who used no water and needed no water, past or future, from $150 a year to $225 a year. It appears from the record that the increased maintenance charge was put into effect by defendant not only to cover increased maintenance costs but also for the purpose of amortizing its original purchase price of the Dawson County Irrigation Company canal and works, the repayment of sums borrowed to meet deficits previously incurred in the operation thereof, and for financing capital improvements and replacements.

Plaintiffs refused to recognize the district's authority

to so increase the rate, refused to enter into a new agreement providing therefor as proposed by defendant, and so advised the district. However, plaintiffs offered at all times to perform the contract as originally executed, and tendered full payment of the maintenance charges at the regular original contract rate with interest, which defendant refused to accept because it was allegedly insufficient to discharge their duty under the increased maintenance rate. Thereafter, on December 3, 1949, plaintiffs filed this action, wherein decree was rendered on December 11, 1950.

In the district court, and again in this court, plaintiffs contended that, because of materially changed conditions and abrogation of the contract by defendant, together with its refusal to perform the same in the light of the provisions of statutes applicable thereto and a part thereof as originally executed, they were entitled, upon reasonable notice, to rescind the contract and have the same cancelled and the title to their land quieted against the same. Such alleged material conditions were their lack of use or need for irrigation water past or future, and defendant's attempt under the provisions of statutes authorizing it to organize and operate, which were never a part of the contract as originally executed, to force plaintiffs to pay alleged increased maintenance rates for amortization of the original purchase price of the Dawson County Irrigation Company canal and works, for repayment of sums borrowed to meet deficits previously incurred in the operation thereof, and for financing capital improvements and replacements. We sustain plaintiffs' contentions.

On the other hand, defendant contended and here contends that the contract contained covenants running with the land imposing an easement on plaintiffs' land and defendant's canal; that the contract as originally executed was made with reference to the subject and existing law under which defendant district was organized and authorized to operate, thus giving it the

right to increase maintenance rates in the manner and for the purpose for which it was done; and that the contract, having no termination date, was perpetual without right of cancellation by plaintiffs or defendant. We conclude that the contention has no merit.

Fundamental rules of law governing the construction and application of such contracts should first be discussed.

In 3 Farnham, Waters and Water Rights, § 614, p. 1935, it is said: "A relation between a consumer and a carrier may be established in either one of three different ways, or by a combination of two or more of them: (1) It may depend upon the consumer taking advantage of the statutory duty of the carrier to supply water at fixed rates; (2) it may depend upon the consumer's relation to the carrier as one of its stockholders; or (3) it may be formed by a simple contract between the carrier and consumer. The rights and duties of the parties under these several modes of establishing relations may differ, and the rights claimed under either may, as has already been suggested, be modified by the existence of one of the other factors. So far as the right depends upon a simple contract relation it is similar to any other contract for a water supply, * * *." As stated in 30 Am. Jur., Irrigation, § 40, p. 624: "The right to use water for irrigation purposes may be acquired by contract. Such agreements, generally speaking, are governed by the same rules that pertain to other contracts * * *." See, also, 56 Am. Jur., Waters, § 256, p. 712; 67 C. J., Waters, § 1076, p. 1404, § 1077, p. 1406, § 1078, p. 1407.

In Watkins & Co. v. Kobiela, 84 Neb. 422, 121 N. W. 448, this court held: "Statutes, with reference to which contracts are made, enter into and become part of the contract. Sessions v. Irwin, 8 Neb. 5." See, also, 3 Williston on Contracts, Revised Edition, § 615, p. 1767.

In Vonburg v. Farmers Irrigation District, 132 Neb. 12, 270 N. W. 835, it was held: "The law in existence at the time a contract is made measures its legality,

subject to any limitations subsequently made under the police power of the state."

In McWilliams v. Griffin, 132 Neb. 753, 273 N. W. 209, 110 A. L. R. 1039, it is said: "This principle embraces alike those which affect its validity, construction, discharge, and enforcement."

As stated in 17 C. J. S., Contracts, § 330, p. 784: "So, when a statute prescribes a duty and a contract is made involving performance of that duty, such statute becomes a part of the contract; or, where the law authorizes the regulation of service rendered the public, such law becomes a part of and controls contracts providing for the public service."

As stated in 17 C. J. S., Contracts, § 464, p. 956: "Where from the nature of the contract it is evident that the parties contracted on the basis of the continued existence of the person or thing, condition or state of things, to which it relates, the subsequent perishing of the person or thing, or cessation of existence of the condition, will excuse the performance, a condition to such effect being implied, in spite of the fact that the promise may have been unqualified."

As stated in 17 C. J. S., Contracts, § 398, p. 887: "However, a construction conferring a right in perpetuity will be avoided unless compelled by the unequivocal language of the contract, and a contract will not be construed as imposing a perpetual obligation when to do so would be adverse to public interests."

It is contrary to public policy in this state to continue to furnish irrigation water to lands when no further beneficial use can be made of such waters thereon. Farmers' Canal Co. v. Frank, 72 Neb. 136, 100 N. W. 286; State v. Birdwood Irrigation District, 154 Neb. 52, 46 N. W. 2d 884.

It will be noted that neither plaintiffs nor their predecessors were ever stockholders in or owned any interest in property of the Dawson County Irrigation Company, a public service utility corporation, which never owned

or conveyed any land or the equivalent thereof to plaintiffs, but, having organized and obtained an appropriation of .irrigation water belonging to the public, was contractually engaged as a common carrier by means of its canals and ditches in rendering a service for compensation and its own profit, by conveying that public commodity to lands for which it had been appropriated.

In the contract here involved, the corporation did not agree to do or refrain from doing anything on its own lands or property except to maintain and keep in good repair its own canals and laterals, a duty otherwise at all times imposed by section 46-274, R. S. 1943. The corporation by this contract conveyed nothing, but simply agreed, for a consideration, to deliver irrigation water during the irrigation season of each year to the boundary of plaintiffs' land into a sub-lateral ditch or canal, to be made and provided at plaintiffs' expense. Otherwise it did not agree to do or refrain from doing anything on plaintiffs' land. In that connection, plaintiffs' grantor conveyed to the corporation a right-of-way through its land for the canal and laterals of the corporation, as then constructed thereon, and released any and all claims then existing for loss or damage by reason of any leakage, seepage, breakage, or overflow from any canal, lateral, sub-lateral, or ditches of the corporation to any land owned or controlled by the College.

At the time of the execution of the contract, it was made with reference, among others, to the following applicable and controlling statutes then existing, which became a part thereof.

Section 46-268, R. S. 1943, provided in part: "Whenever any person owning any irrigation ditch or canal, shall convey by deed or contract the right to use the water from such ditch or canal for any tract of land for irrigation purposes, such deed or contract shall be recorded in the county where such land is situated, in the same manner and under the same conditions as

deeds for real estate. Such deed or contract, from the date of the recording thereof, shall be binding upon the *grantor, his, their or its successors or assigns, and all persons claiming any interest in such ditch or canal."* (Italics supplied.)

Section 46-270, R. S. 1943, provided: "Any corporation or association organized under the law of this state for the purpose of constructing and operating canals, reservoirs, and other works for irrigation and water power purposes, shall have power to borrow money, to issue bonds, and to mortgage its property and franchises in the same manner as railroad corporations; * * *."

Section 46-271, R. S. 1943, provided in part: "Any corporation or association organized under the laws of this state for the purpose of constructing or operating canals, reservoirs or other works for irrigation purposes may, through its board of directors or trustees, assess the shares, stock or interest of the stockholders thereof for the purpose of obtaining funds to defray the necessary running expenses."

Section 46-274, R. S. 1943, provided: "Every person managing, owning or controlling any irrigation works for the storage, carriage or diversion of water, except irrigation districts, shall keep its headgates, diversion dams, canals, and laterals in reasonable and proper repair for the delivery and diversion of water to the appropriators under its canal, and the regulation thereof shall be under the control and direction of the State Railway Commission."

Section 46-275, R. S. 1943, provided: "Irrigation works constructed under the laws of this state are hereby declared to be common carriers. The owner or operator of any works for the storage, carriage or diversion of water, except irrigation districts, shall deliver all water legally appropriated to the parties entitled thereto at a reasonable rate, to be fixed by the State Railway Commission."

It will be noted that by virtue of section 46-268, R.

S. 1943, the right to use the water during the irrigation season of each year was binding on the grantor, its successors, or assigns and all persons claiming any interest in such ditch or canal. However, neither plaintiffs nor their predecessors claimed any interest in the ditch or canal as such. The water to be furnished, which the corporation did not own, was simply contractually appurtenant to their land.

In that connection, it was held in Farmers & Merchants Irrigation Co. v. Hill, 90 Neb. 847, 134 N. W. 929, 39 L. R. A. N. S. 798, Ann. Cas. 1913B 524, that: "A purchaser of land from one who holds a water-right contract thereon with an irrigation company, and who takes title thereto by a deed containing the ordinary covenants of warranty, with no reference to the question of water rights, and who refuses to accept water from the company, is not personally liable for the maintenance fee mentioned in the water-right contract between his grantor and the irrigation company, and an action cannot be maintained against him to recover a personal judgment therefor."

In the opinion it was said: "From the statutes and decisions referred to it would seem that the waters in the running streams of the state are public property, subject to be diverted and applied for beneficial uses. That ditches may be constructed to carry the water to agricultural lands for a reasonable compensation would seem proper, and the owner of the land may undoubtedly obligate himself to assist in the construction and maintenance of the ditch. If the owner of the land after incurring an obligation of this kind sells and conveys it, is there any obligation upon the part of his grantee to keep up a maintenance fee, although he has not undertaken to do so by any personal promise?

"We think that the following authorities tend to show that the defendant is not personally liable, and some of these decisions perhaps tend to show that he is not liable as grantee for any burden unless he and the

plaintiff in the case are privies in estate: 17 Viner, Abridgment of Law and Equity (Privity), p. 534; 2 Bouvier, Law Dictionary; Hurd v. Curtis, 19 Pick. (Mass.) 459; Educational Society v. Varney, 54 N. H. 376; 2 Washburn, Real Property (6th ed.) secs. 1203-1205; Cole v. Hughes, 54 N. Y. 444; Scott v. McMillan, 76 N. Y. 141; Nesbit v. Nesbit, 1 Taylor (N. Car.) 403 (318); Webb v. Russell, 3 T. R. (Eng.) 393; Keppell v. Bailey, 2 Myl. & K. (Eng.) 517; 4 Kent, Commentaries, *473; Mygatt v. Coe, 124 N. Y. 212; Pool v. Morris, 29 Ga. 374; Patton v. Pitts, 80 Ala. 373; Kettle River R. Co. v. Eastern R. Co., 41 Minn. 461; Bloch v. Isham, 28 Ind. 37; Weld. v. Nichols, 17 Pick. (Mass.) 538; Bally v. Wells, 3 Wils. (Eng.) 25." However, plaintiffs did. not cross-appeal and the personal judgment against them will not be disturbed.

Lingle Water Users' Assn. v. Occidental Building & Loan Assn., 43 Wyo. 41, 297 P. 385, cited and discussed the foregoing Nebraska case with approval for its conclusion that an agreement to pay maintenance charges as a consideration for the right to use irrigation water was, under circumstances comparable with those at bar, not a covenant running with the land for want of privity of estate, which can be created only in connection with a grant of the land sought to be charged or an estate therein or the equivalent thereof, and that a right to the use of irrigation water to be delivered by such a utility was not a right in land or the equivalent thereof. See, also, Cabell v. Federal Land Bank of Spokane, 173 Or. 11, 144 P. 2d 297, which cited such Nebraska case in support of a like conclusion.

In that connection, this court said in Farmers Canal Co. v. Frank, *supra*: "The doctrine of private ownership of water for irrigation purposes, disassociated from the land to which it is designed to be applied, has been proved by long experience to be detrimental to the public welfare. * * * The other doctrine is that the right to the use of water should never be separated from the

land to which it is to be applied. 'Where this doctrine prevails, canals and ditches become like railroads, great semi-public utilities, means of conveyance of a public commodity, their owners entitled to adequate compensation for services rendered, but having no ownership in the property distributed.' * * *   The irrigation company does not own the water; it is only the servant of the public to carry it to the land for which it has been appropriated, * * *." See, also, 2 Wiel, Water Rights in the Western States (3d ed.), p. 1241; Farmers & Merchants Irrigation Co. v. Brumbaugh, 81 Neb. 641, 116 N. W. 512.

As stated in Sammons v. Kearney Power & Irrigation Co., 77 Neb. 580, 110 N. W. 308, 8 L. R. A. N. S. 404: "In this respect it stands on the same footing as a railroad company."

In Enterprise Irrigation District v. Tri-State Land Co., 92 Neb. 121, 138 N. W. 171, it is said: "This court has repeatedly said that a canal company is to a certain extent a public service corporation; that it does not own the water that it carries, but acquires by appropriation the right to divert the same and to charge a reasonable fee for the carriage of the same to the lands upon which it was designed to be used. Paxton & Hershey I. C. & L. Co. v. Farmers & Merchants I. & L. Co., 45 Neb. 884; Castle Rock I. C. & W. P. Co. v. Jurisch, 67 Neb. 377; McCook Irrigation & W. P. Co. v. Crews, 70 Neb. 115."

In 3 Farnham, Waters and Water Rights, § 613, p. 1935, it is said: "In Wheeler v. Northern Colorado Irrig. Co. (10 Colo. 582, 3 Am. St. Rep. 603, 17 Pac. 487) it is said that the courts should jealously guard the rights of the carrier, and so deal with it; the Constitution and statutes permitting, as to encourage the investment of capital in the construction of reservoirs and canals for the storage and transportation of water. But the court further said that the question of the rights of water companies in connection with the water diverted will be governed by the user's rights, and not by those of the

water company, for a carrier does not become the proprietor of the water diverted, but merely has a right to compensation for his services in carrying it to the point where it is needed." The same rule was followed in Wyatt v. Larimer & Weld Irrigation Co., 18 Colo. 298, 33 P. 144, 36 Am. S. R. 280, reversing 1 Colo. App. 480, 29 P. 906.

In Miller v. Railroad Commission, 9 Cal. (2d) 190, 70 P. 2d 164, 112 A. L. R. 221, it is said: " 'No private estate can be created in property devoted to a public use, and a consumer of water cannot have a water right in the sense of a freehold interest in the real estate of the distributing company; that his right is simply a right of service.' (Glenn-Colusa Irr. Dist. v. Paulson, 75 Cal. App. 57, 69 [242 Pac. 494]. See, also, Leavitt v. Lassen Irr. Co., 157 Cal. 82 [106 Pac. 404, 29 L. R. A. (N. S.) 213]; Coulter v. Sausalito Bay Water Co., 122 Cal. App. 480, 497 [10 Pac. (2d) 780]; Hildreth v. Montecito Creek Water Co., 139 Cal. 22, 29 [72 Pac. 395].)"

In Glenn-Colusa Irrigation Dist. v. Paulson, 75 Cal. App. 57, 242 P. 494, it is said: "The supreme court of this state in Leavitt v. Lassen Irrigation Co., 157 Cal. 82 [29 L. R. A. (N. S.) 213, 106 Pac. 404], heretofore referred to, holds, in substance, that no private estate can be created in property devoted to a public use, and a consumer of water cannot have a water right in the sense of a private freehold interest in the real estate of the distributing company; that his right is simply a right of service. This, of course, carries with it the right to that service so long as the public utility controls the instrumentality rendering the service. The exercise and enjoyment of such right of service does not create an easement such as is contemplated by section 552 of the Civil Code, but is a service rendered by a public utility subject to the regulation and control of the state in such manner as may be prescribed by law."

It will be noted that plaintiffs' land was never located in, a part of, or included in a contractual self-

governing irrigation district, organized and operated under the authority of Chapter 46, article 1, R. S. 1943, and that plaintiff's right to abandon and have cancelled the right to the use of irrigation water services would not be controlled by those provisions.

Further, the contract here involved was not made with reference to provisions of the statute then existing which permitted the organization and prescribed the authority of a public power and irrigation district such as defendant. The police power of the state neither then nor subsequently made such statutes operative as a part of a contract such as here involved.

In Halligan v. Elander, 147 Neb. 709, 25 N. W. 2d 13, it is said: "However, 'so far as they are applicable' as stated in the opinion, or 'applicable, as nearly as may be,' as stated in section 70-667, R. S. 1943, is always the controlling language which cannot be overlooked to determine the force of the adopted statute in a particular situation.

"It is clearly observable that the circumstances of both the organization and operation of public power and irrigation districts, as well as their uses of water, are entirely different from irrigation districts, * * *." By analogy, the organization and operation of such districts as well as their uses of water are entirely different from irrigation corporations.

We find no provisions in the statutes or other authority, and none in point have been cited, which would permit such a district to purchase an irrigation corporation such as the Dawson County Irrigation Company, and ipso facto make the laws authorizing and prescribing its organization and operation a part of the original contract without plaintiffs' consent, actual or implied, by estoppel or otherwise, which does not appear in this case.

When plaintiffs herein purchased the land, they took whatever rights as were possessed and assumed such obligations as were imposed upon their original predecessors, no more and no less, and stood in their shoes.

Likewise, when defendant purchased the corporation, it stood in the shoes of such corporation. To hold otherwise would permit defendant to legislate and thus make police power operative by mere purchase without proper legislative authority. In that regard, it is sufficient for us to say that plaintiffs' contract did not make them liable as owners or co-owners of defendant's works for an increased maintenance rate with which to amortize defendant's original purchase price of the corporation or to make repayment of sums borrowed to meet deficits previously incurred in the operation thereof or for financing capital improvements and replacements. In that connection, when defendant attempted to force plaintiffs to so perform and it otherwise refused to perform and threatened foreclosure upon plaintiffs' land at the thus increased rate, it abrogated the contract and there were material changed conditions which gave plaintiffs the right to rescind and cancel the contract and quiet the title to their land as against the same.

It is generally the rule that: "* * * where a contract requires successive steps to be taken by the respective parties, if, when a step becomes due, the party either in words or by their equivalent in acts declines to take it, or is unable, while the other is ready and willing to do his part, the latter may rescind the contract." Bishop on Contracts (2d ed.), § 827, p. 341.

On the other hand, in Farmers & Merchants Irrigation Co. v. Hill, *supra,* construing a similar contract, it is said: "The contract sought to be enforced is executory." Upon that premise, we call attention to Hale v. Hess, 30 Neb. 42, 46 N. W. 261, wherein, after quoting from, approving, and relying upon Bishop on Contracts (2d ed.), § 837, p. 347, this court held: "A party to an executory contract has the right to rescind the contract, and terminate it wholly, without the consent of the other party, who is in no fault; the first party becoming liable to the other in any damages he may have sustained, or any compensation he may have earned, by reason of the

rescission." As stated in Bishop on Contracts (2d ed.), § 837, p. 347: "If this were not so, one might be ruined by an undertaking the carrying out of which a change in circumstances rendered highly inexpedient or practically impossible."

As a matter of course, the general rule stated above is subject to the right of specific performance as a partial exception thereto, which defendant has no right to enforce at the increased maintenance rate.

In that connection, a careful analysis of all the authorities cited by defendant does not disclose a single case in which the court said or concluded, under circumstances comparable with those at bar, that a consumer must continue to accept the water services offered and pay for the same at the increased rate. After diligent search, also, we have found none. The authorities hold otherwise.

In Law v. Railroad Commission, 184 Cal. 737, 195 P. 423, 14 A. L. R. 249, wherein the commission had subsequently fixed rates for steam and electricity involved in a comparable contract, the court said: "It follows, of course, in view of the change effected by the order in such an important part of the contract, that petitioner will have the right under the law to rescind the contract, and prevent further use of his property by the former company, except for compensation properly determined." See, also, Annotation 14 A. L. R. 252; McCullough-Dalzell Crucible Co. v. Philadelphia Co., 223 Pa. 336, 72 A. 633.

In Miller v. Railroad Commission, *supra,* it is said: "It is true this water had been dedicated to a public use, but we have been cited to no authority, and we have been unable to discover any through our own efforts, which holds that a water user, having no further use for the waters furnished by a public utility, can be forced either to receive his proportion of those waters or to pay for the same without using it." See, also, 3 Farnham, Waters and Water Rights, § 609, p. 1917; 2 Wiel,

Water Rights in the Western States (3d ed.), § 1328, p. 1234; South Boulder &. R. C. Ditch Co. v. Marfell, 15 Colo. 302, 25 P. 504.

In 43 Am. Jur., Public Utilities and Services, § 99, p. 641, it is said: "If a contract for public utility rates in return for a conveyance is modified or abrogated by legislation or a regulatory body, it does not necessarily follow that the grantor is without a remedy. Indeed, the majority of the cases hold that one who has parted with property in return for a rate contract which is subsequently prohibited or modified by public authority may have the contract rescinded or recover damages."

It may be argued that the foregoing reasons, or some of them, for our decision were not those given by the trial court in its decree. Be that as it may, the applicable rule is: "A proper judgment under the pleadings and the evidence will not be reversed on appeal merely because the trial court did not give the right reason for the decision." Sopcich v. Tangeman, 153 Neb. 506, 45 N. W. 2d 478.

For the reasons heretofore stated, the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.